IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2008

**IN THE MATTER OF DERRICK B.**

**Appeal from the Juvenile Court for Macon County**
**No. 07-172872     Ken Witcher, Judge**

_____

**No. M2008-01162-COA-R3-PT - Filed December 30, 2008**

_____

The trial court terminated the parental rights of Ethel B. ("Mother") and David B. ("Father") to their son, Derrick B. (the "Child"), who was 11 at the time of trial. The trial court found, by clear and convincing evidence, that several grounds for terminating Mother's and Father's parental rights existed and that termination is in the best interest of the Child. Mother and Father appeal, challenging the trial court's finding that clear and convincing evidence of grounds to terminate were established at trial. Mother and Father also challenge the trial court's finding that clear and convincing evidence was presented that termination of the parents' rights is in the Child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., and ANDY D. BENNETT, JJ., joined.

William J. Butler, Lafayette, Tennessee, for the appellants, Ethel B. and David B.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Preston Shipp, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

I.

The genesis of this litigation is an earlier petition to declare the Child dependent and neglected. The trial court granted the Department of Children's Services ("DCS") immediate temporary protective custody of the Child and scheduled the petition for a hearing. In July 2006, the court conducted a full evidentiary hearing on DCS's petition seeking to have the Child adjudicated dependent and neglected. The trial court granted the petition. The court's order provides, in pertinent part, as follows:

Upon the evidence presented, statements of counsel and the record as a whole, the Court finds that the State has proven by clear and convincing evidence that [the Child] . . . is dependent and neglected within the meaning of the law . . . .

The finding of dependency and neglect is based upon the following findings of fact:

[Mother and Father] are unfit to properly care for the child, the child is under improper guardianship and control as to endanger the morals and health of the child and the child is suffering from abuse.

This finding is based upon the fact that [Father] has on numerous occasions committed an act of sexual abuse and rape of a minor child in his custody on [his nieces]. [Father] threatened to kill [his nieces] if they reported the sexual abuse and rape. This type of conduct places [the Child] at risk and the acts place the child in a situation that is a danger to his morals and health. [Father] has physically abused [his nephew and nieces] by hitting them with his fist in the head and body. [Father] has thrown knives at [his nephew] placing him at substantial risk of serous bodily injury. [Father] has provided alcohol to [his nephew and the Child]. [Father] has provided a controlled substance to [his nephew]. [Father] has physically abused [the Child] by hitting him with his fist and by whipping him excessively on numerous occasions. [Father] has an alcohol problem. . . . [Father] has been violent and abusive to [Mother] . . . in the presence of [the Child].

[Mother's] testimony is not credible. The evidence showed that [Mother] is not protective of [the Child] and of other children in the home. She did not tell the truth about the abuse [Father] has perpetrated upon [the Child]. [Mother] failed to be honest about what was going on in her home regarding the allegations that [Father] had raped his nieces placed in his care. [Mother] went further than failing to tell the truth about the abuse and she lied for [Father]. She is an unbelieving parent and she lies to protect [Father]. She has repeatedly chosen to protect her husband over her children. . . . [Mother] has engaged in inappropriate contact with [the Child] by touching his private parts when it was not necessary and when he did not want it. . . . [Mother] has engaged in illegal conduct by selling controlled substances from her home. [Mother] is currently on probation for selling controlled substances.

Based upon the foregoing, the Child was removed from his parents' home and placed in foster care. No appeal was taken from the order finding the Child dependent and neglected.

The petition to terminate parental rights was filed in September 2007. In the petition, DCS sought to terminate the parental rights of Mother and Father on three different grounds. First, pursuant to T.C.A. § 36-1-113(g)(2), DCS alleged that both parents had failed to substantially comply with the statement of responsibilities contained in their permanency plans, despite reasonable efforts on the part of DCS to assist them with compliance. Next, pursuant to T.C.A. § 36-1-113(g)(3), DCS alleged that: (1) the Child had been removed from the home for a period of at least six months by order of the court; (2) the conditions which led to the Child's removal from the home still exist and other conditions exist which in all likelihood would cause the Child to be subjected to further abuse or neglect; (3) it was unlikely that the Child could be returned to either Mother or Father in the near future; (4) there was little likelihood that the conditions that prevented the Child from being returned to the custody of Mother and/or Father would be remedied at an early date; and (5) continuation of the parent-child relationship with either or both parents greatly diminishes the Child's chances of early integration into a safe and stable home. The third ground for termination was based on T.C.A. § 36-1-113(g)(4). Specifically, DCS alleged that Father had committed severe child abuse on children that had lived in his home and Mother knowingly failed to protect these children from said abuse. Finally, DCS alleged that it was in the Child's best interest for the parental rights of Mother and Father to be terminated.

In January 2008, a trial was held on DCS's petition. The first witness at trial was Jeffrey Scott Herman, a senior psychological examiner and licensed professional counselor. He had worked in the mental health profession since 1989 and had worked, for the entire period, with children who are victims of abuse or neglect. Herman had received training from the Sex Offender Treatment Board as well as training for evaluating sex offenders and determining whether a given offender posed a continuing risk. The trial court accepted Herman as an expert witness after counsel for Mother and Father had an opportunity to voir dire him as to his qualifications.

Herman conducted a psychological evaluation on Father, which included a sex offender assessment. The psychosexual examination revealed that Father was attempting to minimize or even conceal interest and information on the sex-related items. Herman acknowledged that, absent an admission, there is no way a psychosexual assessment could definitively ascertain if an individual is a sex offender. However, in the field of psychosexual analysis, a polygraph examination is an accepted tool to use in an assessment. Herman added that it was an accepted practice in his profession to rely upon the results of a polygraph examination when evaluating and treating patients. Herman stated that the psychosexual assessment on Father was inconclusive due to his defensiveness on the sex-related questions. The test also revealed that Father was in "severe psychological distress." He also was diagnosed as being alcohol dependent. According to Herman, alcohol use is associated with increased risk for domestic violence as well as physical and/or sexual abuse of children. The test revealed that Father had several mistaken ideas of what is normally accepted as right and wrong regarding sexual behaviors. Based on these results, Herman questioned Father

further and Father changed his answers, indicating either that he was lying or that he did not understand the questions the first time.

Herman's final conclusion was that Father had a cognitive distortion of the effects of sexual acts with children. According to Herman, "some of the items [Father] had endorsed . . . are things that are commonly used by sex offenders as rationalizations for sex offenses, and that concerned me." Herman testified as follows:

> Q. Given this Court's finding that [Father] sexually abused and raped his nieces, repeatedly, is sex offender treatment, in your opinion, necessary and successful completion of it [necessary] in order to protect children who would be in his care and control?
>
> A. Yes. . . . [And ongoing polygraph examinations would be necessary] to make sure the person is complying with a safety plan.

Herman then added that sex offenders who do not complete a residential treatment program are at a much higher risk of recidivism and, without completion of treatment, no child is safe in a sex offender's care.

Herman also evaluated Mother. Herman stated that Mother received a very low score on the comprehension sub-scale on one of the tests, and that sub-scale:

> basically measures a person's comprehension of what's going on around them, and that was low, and if a person is residing in a house with a person that has been found to be a sex offender, I would be very concerned about are they aware of everything that is happening, are they adequately aware of the risk factors. So, yes, that would be a risk factor in this case.
>
> Q. In your opinion would that be a risk factor that would prevent [Mother] from protecting her son . . . from sexual abuse by [Father] if [the Child] was back in the home?
>
> A. Yes.

The earlier order by the Juvenile Court recited a finding that Father had provided alcohol to the Child and had hit him. According to Herman, this type of behavior is likely to cause psychological damage to the Child. Herman added:

> [A]buse increases the risk of post-traumatic stress disorder. It's demonstrated in impaired social functioning. . . . [Abuse] increases

the risk of delinquency and it would also increase the risk of depression. We know school functioning also drops.

Q. As to [the Child], if he was in the same household, was in the environment where his cousins are being physically abused, sexually abused . . . is the exposure to all of this abuse likely to result or cause [psychological problems?]

A. They are the same risk factors . . . . The research has shown that children who witness domestic violence suffer the same negative psychological and social outcomes as children that are physically abused directly.

Herman then stated that having one parent who fails to protect the child from the other parent also contributes to the psychological impact of the abuse. "[L]ogically, the child feels abandoned when they're not protected by another parent in the home."

Herman also evaluated the Child. The Child explained to Herman a time when, while in the care of Mother and Father, the Child told his parents that he was being threatened by someone and Father gave him a switchblade to put under his pillow at night. Herman explained that he had two concerns about this situation:

One, I'm concerned about the impact of a child – I'm concerned about sending a child the message of we can't protect you, you have to protect yourself, from what he perceives is a life-threatening situation. Regardless of whether that's accurate or not, that's the way the child perceived it. Secondly, we know that children copy behaviors they see . . . , so we've got a child that's had all these behaviors modeled and then we're giving him a weapon? I'm not saying the child would definitely copy the behaviors [he has] seen but there definitely is a risk thereof.

Herman testified to the importance of stability in a child's life. When asked what impact would occur on the Child's mental health if permanency was delayed and he did not know if he was going to return home or continue in foster care, Herman concluded that this would result in "[i]ncreased anxiety and impaired social development."

A lot of Herman's testimony was based upon his reports created after evaluating Father, Mother, and the Child. Herman's report on Father contains the following:

**REVIEW OF RECORDS**

A report of a polygraph examination conducted on [Father] . . . on June 7th 2006 was provided to the examiner . . . . The report indicates that he was asked relevant questions about contact with his nieces' vagina[s]. The conclusion of the evaluation was "it is therefore my professional opinion that [Father] was not truthful/lied when he answered the relevant questions as listed above."

(Capitalization and bold print in original.)

During direct-examination of Herman, counsel for Father objected to any information being admitted at trial concerning Father not passing the polygraph examination. Father's counsel sought to have the quoted excerpt and any mention of the failed polygraph examination removed from Herman's report. Following extensive arguments by counsel, the trial court denied the motion, stating:

The Court is going to deny [Father's] motion to strike that paragraph. As [counsel for DCS] stated, the previous order does reflect that the Court has made the finding of abuse already so that particular issue that's addressed in this paragraph about whether he sexually abused [his nieces] has already been decided by the Court and so I can't see any harm in that statement being – any harm to [Father] in that statement being in this report. And I do also believe the fact that the testimony of this witness has been that polygraph tests are routinely used and accepted as part of the treatment, that, again, I think weighs against [Father's] motion to strike. So the motion is denied.

The next witness was Clay Farris, a clinical case worker employed by Health Connect America. Health Connect America furnishes contract work for DCS. Farris has received specialized training with respect to treating sex offenders. Farris treated Father from March 14, 2007, through May 30, 2007. Farris "restarted" treating Father again a few days prior to trial. Farris stated that during Father's treatment, he sometimes had problems with Father being able to retain what they had worked on in the previous session. Because of Father's complaints of being "bullied" at the first polygraph examination, Farris arranged for a second polygraph examination. The results of the second polygraph examination were the same as the first and showed deception. Farris discontinued treatment because Father continued to deny that he had sexually abused his nieces. However, on one occasion, Father admitted doing "what he called a 'titty twister' on one of his nieces."

On cross-examination, Farris was questioned about his notes of April 12 wherein he asked Father if he was thinking about the materials that had been furnished to him. Farris acknowledged that his notes state that he:

-6-

spoke with client about the materials presented thus far, inquired if client engaged in thought about these materials when not with case manager. Client denies thinking about the material on his own time. Client goes on to state that this is BS to have to go through with when you're innocent of any wrongdoing. He states that the Pathfinders and anger management classes were a waste of time and government money.

Kim Matthews was called as the next witness. She is employed by DCS as a family service worker and was assigned to the Child's case when he came into the custody of DCS. Matthews developed the permanency plans for both parents. She testified that both parents signed the permanency plans as well as the criteria for termination of parental rights. She stated that neither parent made adequate progress or change such that the Child could be returned to their care. Matthews testified that the requirements in the permanency plans were reasonable and necessary. As pertinent to this appeal, she testified as follows:

> Q. For [Mother], you've stated in the petition for termination of parental rights that the requirements in the permanency plan she did not complete were protecting the children from sexual abuse, attending counseling that addressed protecting the child from sexual abuse and the harm caused by the sexual abuse, and verbally expressing her understanding of the trauma caused by the sexual abuse and the need to protect her child from the sexual abuse. Is that still correct, that's the portion of the permanency plan that she has not complied with?
>
> A. Yes.
>
> Q. And in all fairness, she has complied with a number of other requirements in the plan, such as the A and D treatment and going to counseling for anger management and other issues, hasn't she?
>
> A. Yes.
>
> Q. Given the reasons for removal, what is the most important thing as far as [Mother] is concerned that she do and demonstrate a change in order to make it safe for [the Child] to return home?
>
> A. Well, to protect her child from sexual abuse. That was an issue.
>
> Q. Again, with [Father] . . . you put in the petition he's not done . . . the psychosexual results were inconclusive due to his

defensiveness and he's failed to complete treatment for the sex offenses. Is that still correct?

A. Yes. . . .

Q. [Father] has completed A and D treatment through Pathfinders and gone to anger management and counseling at –

A. Valley Ridge.

Q. – Valley Ridge. What is the most important thing, though, in the perm[anency] plans for him to successfully complete in order to safeguard [the Child] if he were returned to the home?

A. The sex offender classes.[1]

* * *

Q. In your opinion do the conditions still exist that caused [the Child] to be removed from the home of [Mother and Father], or do other conditions exist which would in all probability cause the child to be subject to further abuse or neglect making it unlikely he could be returned to them in the near future?

A. Yes. . . .

Q. In your opinion is their [sic] little likelihood that these conditions would be remedied at an early date so the child could be returned to [Mother or Father] in the near future?

A. Yes.

Q. In your opinion is the continuation of the parent/child relationship, does it greatly diminish [the Child's] chance of early integration into a stable and permanent home . . . ?

A. Yes.

Q. Do [Mother and Father] continue to reside together?

---

[1] Matthews was questioned extensively as to the reasonable efforts she made on both parents' behalf. Whether Matthews and/or DCS made a reasonable effort on the parents' behalf is not an issue on appeal so we have omitted this testimony. Having said that, we would point out that the record affirmatively reflects that reasonable efforts were made.

A.   Yes.

Q.   Has [Mother] demonstrated or been able to vocalize to you any change that would demonstrate that she would protect her child from sexual abuse?

A.   No.

Q.   Has she been able to vocalize or demonstrate to you any change to show that she would no longer touch her son's genitals or buttocks?

A.   No. . . .

Q.   In your opinion have [Mother or Father] made an adjustment of circumstances, conduct or condition as to make it safe and in the child's best interest to be in the home of the parents?

A.   No.

Q.   In your opinion have [Mother or Father] failed to effect a lasting adjustment after reasonable efforts by available social agencies for such a duration of time that lasting adjustment does not appear reasonably possible?

A.   Yes.

Matthews also testified that the Child's older brother had been removed from Mother and Father's home in West Virginia when the Child was a few months old. The older child was removed based on physical abuse at the hands of Father. Mother's parental rights to this child were terminated years ago by the State of West Virginia. Father was not the biological father of this older child.

For the sake of brevity, we will not summarize the testimony of the Child's former and current foster parents. Suffice it to say, however, that the record reflects that the Child has been placed in good foster homes and is doing well. The current foster parents, who have four children of their own, intend to adopt the Child if he is made available for adoption.

Mother testified that she has taken care of the Child since his birth and that there is no reason why she could not continue to care for him. Mother is on social security disability and receives $956 a month. Father also receives social security disability benefits. Mother and Father rent a two bedroom trailer. The Child has his own bedroom. When asked why she stayed with Father, Mother stated it was because she knew he did not do anything wrong. The Child has told Mother that he

wants to come home. Mother testified that she knows it is wrong for an adult to have any kind of sexual contact with a child. Mother acknowledged that she is on probation and stated that she has not violated her probation. Father chose not to testify at trial.

Following the trial, the trial court entered a detailed order terminating the parental rights of Mother and Father. According to the trial court[2]:

> The Court finds that the State of Tennessee, Department of Children's Services has made reasonable efforts to assist [Mother and Father] in: (1) visiting the child; (2) establishing a suitable home for the child; (3) complying with the requirements in the permanency plans; and (4) remedying the conditions that necessitate foster care.
>
> The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence grounds for termination of parental rights based upon the following findings of fact.
>
> [The Child] was placed in the custody of the Tennessee Department of Children's Services due to dependency and neglect on March 23, 2006.
>
> [The Child] has remained continuously in foster care since March 23, 2006.
>
> [Mother] has not substantially complied with the provisions of the permanency plans and therefore her parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(2).
>
> The permanency plans require her to protect the [Child]. She continues to reside with [Father]. She continues to believe [Father] and to protect him and not the child. She is entitled to do so, but as long as she does, she is not in substantial compliance with the permanency plans.
>
> The requirements in the permanency plans are all reasonably related to remedying the conditions that necessitate foster care. The requirement to protect her child from sexual abuse is of primary importance.

---

[2] We are omitting several of the numbered paragraphs from the trial court's order which have no bearing on this appeal.

The Department made reasonable efforts to assist [Mother] in complying with the requirements in the permanency plan by providing gas cards for transportation to appointments, setting up and paying for a psychological evaluation, setting up and paying for a parenting assessment, setting up and paying for therapeutic visitation, setting up an A&D assessment, setting up and paying for A&D treatment, providing random drug screens, setting up and paying for hair follicle drug screens and mental health counseling.

[Mother] was advised on March 28, 2006, January 18, 2007 and July 5, 2007 that failure to substantially comply with the permanency plans was grounds for termination of parental rights. [Mother] signed the acknowledgment of receipt of the Criteria and Procedure for Termination of Parental Rights on March 28, 2006, January 18, 2007 and July 5, 2007.

[Father] has not substantially complied with the provisions of the permanency plan and therefore his parental rights are terminated pursuant to T.C.A. 36-1-113(g)(2).

The permanency plans require him to complete sex offender treatment. The Court has made findings that [Father] sexually abused and raped his nieces. The Court finds that he is in need of treatment as a sex offender. [Father] does not have to admit to these sex offenses, but to successfully complete sex offender treatment he must either admit to the offense or pass a polygraph examination. The Court heard credible expert testimony from Scott Herman, who is a senior psychological examiner, that sex offender therapist[s] rely heavily on polygraph examinations. The use is accepted in their profession. They place more reliance on the polygraph evaluation than on the court's findings.

The requirements in the permanency plans are all reasonably related to remedying the conditions that necessitate foster care. The requirement to complete a psychosexual evaluation and follow all recommendations was particularly important in reducing the risk of harm to the child so that the child could have been safely returned to the parent's care.

Even though both parents completed a number of tasks on the permanency plans, they did not complete the most important task.

The Department made reasonable efforts to assist [Father] in complying with the requirements in the permanency plan by providing a polygraph, gas cards for transportation to appointments, setting up and paying for a psychological evaluation, setting up and paying for a parenting assessment, setting up and paying for therapeutic visitation, setting up an A&D assessment, setting up and paying for A&D treatment, providing random drug screens, setting up and paying for hair follicle drug screens, mental health counseling, setting up a psychosexual evaluation on two occasions and anger management counseling.

[Father] was advised on March 28, 2006, January 18, 2007 and July 5, 2007 that failure to substantially comply with the permanency plans was grounds for termination of parental rights. [Father] signed the acknowledgment of receipt of the Criteria and Procedure for Termination of Parental Rights on March 28, 2006, January 18, 2007 and July 5, 2007.

The Child has been removed from the custody of the parents for more than six (6) months; the conditions which led to the removal of the child from the home of [Mother and Father] still exist and other conditions exist which in all probability would cause the child to be subject to further abuse and/or neglect, making it unlikely that the child could be returned to [Mother or Father] in the near future; there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to [Mother or Father] in the near future; the continuation of the parent or guardian and child relationship greatly diminishes the child's chances of an early integration into a stable and permanent home and therefore their parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

The conditions that led to the removal of the child from the home of [Mother and Father] are that [Father] sexually abused his nieces . . . who were residing with him at the time; [Father] threatened to kill these girls if they reported the sexual abuse; [Father] physically abused [his nieces and nephew] by hitting them with his fist in the head and body; [Father] threw knives at [his nephew]; [Father] provided alcohol to [his nephew and the Child]; [Father] provided a controlled substance to [his nephew], [Father] physically abused [the Child] by hitting him with his fist and whipping him excessively; [Father] had an alcohol and substance abuse problem; [Father] was violent and abusive towards his wife in the child's presence . . . and

-12-

[Mother] failed to protect the children in her home from the abuse by [Father]; [Mother] lied for [Father]; [Mother] engaged in inappropriate contact with [the Child] by touching his genitals and buttock to assist him using the bathroom and bathing, despite his being able to complete these task[s] without assistance, [Mother] failed to give her child medication as prescribed; [Mother] sold controlled substances; all of which endangered the moral, health and physical well-being of [the Child].

The conditions that prevent the child's return to the parent[s'] home are that [Father] is an untreated sex offender and [Mother] continues to be non[-]protective.

The Department made reasonable efforts to assist the parents in remedying the conditions that necessitate foster care by providing a polygraph, gas card for transportation to appointments, setting up and paying for a psychological evaluation, setting up and paying for a parenting assessment, setting up and paying for therapeutic visitation, setting up and paying for A&D treatment, providing random drug screens, setting up and paying for hair follicle drug screens, mental health counseling, setting up and paying for a psychosexual evaluation on two occasions and anger management counseling.

[Mother and Father] have committed severe child abuse as defined by Tenn. Code Ann. § 37-1-102(b)(21) against [two nieces and a nephew], who are children who resided temporarily or permanently in the home of [Mother and Father], and therefore their parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

Exhibit 4[3] contains an un-appealed finding that [Father] committed numerous acts of rape against [his two nieces]. This meets the criteria for severe child abuse found at Tenn. Code Ann. § 37-1-102(b)(21)(C). Exhibit 4 also contains a finding that [Father] threw knives at his nephew. This act was likely to cause severe bodily harm or death and meets the criteria for severe child abuse found at Tenn. Code Ann. § 37-1-102(b)(21)(A).

Exhibit 4 also contains findings that [Father] hit [his nieces and nephew] in the head and body. He exposed them to domestic

---

[3] Exhibit 4 is an "Adjudicatory and Dispositional Hearing Order" entered by the trial court in August 2006. This order was discussed at the beginning of this opinion and is the order initially finding the Child to be dependent and neglected.

violence. He gave drugs and alcohol to [his nephew]. In the opinion of a qualified expert, Scott Herman, these acts and the environment the children were exposed to was reasonably expected to produce several of the disorders set out in Tenn. Code Ann. § 37-1-102(b)(21)(B), including severely impairing the children's ability to function adequately in their environments.

Mother knowingly failed to protect the children from severe child abuse. She knowingly failed to protect [her nieces] from rape. She lied and attempted to protect [Father] from charges of rape. She knowingly failed to protect [the Child and her nieces and nephew] from [Father] hitting them in the head and body with his fist. She knowingly failed to protect the children from an environment that pursuant to qualified expert testimony could be reasonably expected to cause the children severe disorders set out in Tenn. Code Ann. § 37-1-102(b)(21)(B).

(Footnote added; paragraph numbering in original omitted.)

After determining that these findings demonstrated, clearly and convincingly, that grounds for termination of Mother's and Father's parental rights exist, the trial court undertook a best interest analysis. After reviewing the pertinent statutory factors set forth in T.C.A. § 36-1-113(i), the trial court determined that it had been proven, clearly and convincingly, that it was in the Child's best interest for Mother's and Father's parental rights to be terminated.

II.

Mother and Father appeal the trial court's final judgment. They both claim that the trial court erred when it found clear and convincing evidence that: (1) grounds to terminate their parental rights had been established; and (2) it was in the Child's best interest for the parents' rights to be terminated. As a related issue, Mother and Father claim that the trial court placed excessive reliance upon Father having failed two polygraph examinations.

III.

In cases involving the termination of parental rights, our duty on factual matters is to "determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). Questions of law are reviewed *de novo* with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

Trial courts, unlike appellate courts, are able to observe witnesses as they testify and to assess their demeanor. Thus, trial courts are in a unique position to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). Accordingly, appellate courts will not re-evaluate a trial court's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999), *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987).

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995) *rev'd on other grounds*, *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003)(quoting T.C.A. § 36-1-113(l)(l)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. T.C.A. § 36-1-113 (Supp. 2008) governs termination of parental rights in this state. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." T.C.A. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds, In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction

regarding the truth of the facts sought to be established.  *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

IV.

Before we address whether grounds to terminate parental rights had been established, we will discuss the trial court's use of and reliance upon Father's failed polygraph examinations.  We addressed this same issue in *In re P.J.G.*, No. E2006-02003-COA-R3-PT, 2007 WL 1237789 (Tenn. Ct. App. E.S., filed April 27, 2007), *perm. app. denied August 6, 2007*.  In that case we stated:

> Father's final evidentiary issue is his claim that the report should have been excluded because it relied, in part, on a polygraph examination that was inadmissible.  Father relies on *State v. Pierce*, 138 S.W.3d 820 (Tenn. 2004), a case in which the Supreme Court determined that the trial court erred in relying on the results of the defendant's sex offender polygraph examination when denying the defendant's request for parole.  In reaching this conclusion, the Supreme Court specifically noted that the "propriety of using polygraph tests in treatment and monitoring programs for sex offenders was not at issue in [that] case."  *Id*. at 825 n.7.  The Court also referenced T.C.A. § 39-13-704(d)(2) which discusses the use of polygraph examinations when monitoring and treating "sex offenders who have been 'placed on probation, incarcerated with the department of correction, placed on parole, or placed in community corrections.'"  *Id*. (quoting T.C.A. § 39-13-704(d)(2)).  We note, in resolving this issue, that the polygraph results are not being used in a criminal context to establish Father's guilt or innocence or to establish whether he is entitled to parole.  *See In re A.J.H.*, No. M2005-00174-COA-R3-PT, 2005 WL 3190324, at *10 (Tenn. Ct. App. M.S., filed November 28, 2005), *no appl. perm. appeal filed* (discussing the impact of the father's prior refusal to take a polygraph examination and noting that "[t]here is no statutory prohibition in the use of polygraph tests as a part of a psychosexual evaluation in this non-criminal context."). . . .  The results of the polygraph examination were utilized by Mize for one limited purpose, *i.e.*, to emphasize that Father was not being truthful when he denied sexually abusing J.H.

*In re P.J.G.*, 2007 WL 1237789, at * 10-11.  In light of *P.J.G.*, we conclude that the trial court properly considered Father's failed polygraph test results and we reject the claim that the trial court placed undue emphasis on them.

Mother's and Father's parental rights were terminated pursuant to T.C.A. § 36-1-113(g)(2) -(4) (2005).[4] These statutory provisions provide as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> *   *   *
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;
>
> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; [and]
>
> (4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

---

[4] T.C.A. § 36-1-113(g) has been amended effective January 1, 2009. Even though the amendment has no impact on the present case, we will, nevertheless, cite to the version of the statute in effect at the time of trial throughout this opinion.

The definition of "severe child abuse," referenced in T.C.A. § 36-1-113(g)(4) and relied upon by the trial court in the present case, is found at T.C.A. § 37-1-102(b)(21)(A)-(C) (2005), which provide as follows:

> "Severe child abuse" means:
>
> (A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; [or]
>
> (C) The commission of any act towards the child prohibited by §§ 39-13-502--39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child . . . .[5]

The evidence does not preponderate against the trial court's finding that there is clear and convincing evidence (1) Father was guilty of committing "severe child abuse" as defined by the applicable statutes and (2) Mother "failed to protect the child from the commission of any such act towards the child." T.C.A. § 37-1-102(b)(21)(C).

The next issue is whether the trial court erred when it found that DCS had proven, clearly and convincingly, that Mother's and Father's parental rights should be terminated pursuant to T.C.A. § 36-1-113(g)(2). While there may be several requirements in a permanency plan, some may be more critical than others. Given the findings of the trial court at the dependency and neglect hearing, protecting the Child from sexual or physical abuse was paramount. Matthews testified that Mother failed to complete counseling geared toward Mother learning to protect the Child from abuse and Mother never showed an ability to so protect the Child. This is critical given the trial court's finding that Mother lied on behalf of Father and was trying to protect him, to the detriment of the Child. Likewise, with Father, completion of sex offender treatment was critical to his case. Without successful completion of sex offender treatment and recommendations from that treatment, DCS would be unable to return the Child to Father's care. Accordingly, we affirm the judgment of the

---

[5] The statutes referenced in T.C.A. § 37-1-102(b)(21)(C) pertain to various sexual offenses including aggravated sexual battery, aggravated rape, rape of a child, etc.

trial court finding, clearly and convincingly, that Mother and Father failed to substantially comply with the requirements in their respective permanency plans.

We next determine whether the trial court properly found that additional grounds for terminating Mother's and Father's parental rights had been proven pursuant to T.C.A. § 36-1-113(g)(3). There is no doubt that the Child has been removed from the home for at least six months pursuant to order of the court. Without Mother and Father taking and successfully completing counseling and/or treatment, there is a likelihood of continued abuse which prevents the Child from safely being returned to their care. There was no proof offered at trial suggesting that the conditions subjecting the Child to potential further abuse could or would be remedied at an early date which would thereby allow the Child's return to his biological parents' care in the near future. The Child has been in foster care since March 2006. He has been in good foster homes and his current foster family is desirous of adopting him. Continuation of the parent/child relationship would greatly diminish the Child's chances for integration into a stable and safe home environment. We affirm the trial court's finding that grounds had been proven clearly and convincingly pursuant to T.C.A. § 36-1-113(g)(3).

The next issue is whether the trial court correctly found that grounds had been proven pursuant to T.C.A. § 36-1-113(g)(4). As applicable to the present case, this statute provides that grounds for terminating parental rights exist when:

> The parent or guardian has been found . . . by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse [as defined in § 37-1-102] against the child who is the subject of the petition . . . *or any other child residing temporarily or permanently in the home of such parent or guardian[.]*

T.C.A. § 36-1-113(g)(4) (emphasis added).

With respect to Mother, the trial court specifically found that she had knowingly failed to protect the Child from abuse by Father. In fact, the trial court found that Mother had actually lied to protect Father, all to the detriment of the Child and other children that had lived in the house. Thus, Mother knowingly failed to protect the Child from severe abuse. T.C.A. § 37-1-102(b)(21)(A). The testimony at trial was that the abuse committed by Father upon the Child and other children living in the house was such that the abuse was likely to cause great bodily harm to all of the children. This is no great leap considering the seriousness of the abuse Father was found to have committed. The testimony of Herman, which was unchallenged, was that the abuse inflicted by Father was likely to cause one if not more of the various psychological problems listed in T.C.A. § 37-1-102(b)(21)(B). We affirm the trial court's judgment finding DCS had proven, clearly and convincingly, that grounds existed to terminate the parental rights of Mother and Father pursuant to T.C.A. § 36-1-113(g)(4).

The final issue is whether the trial court erred when it concluded that DCS had proven, clearly and convincingly, that it was in the Child's best interest for Mother's and Father's parental rights to be terminated. The relevant statutory provision is T.C.A. § 36-1-113(i) (2005), which provides as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i). When considering the child's best interest, the court must take the child's, rather than the parent's, perspective. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The facts establish that neither Mother nor Father have made an adjustment of circumstance such that it would be safe for the Child to return to their care. This is the situation despite reasonable efforts made by DCS. The Child has been in foster care since March 2006 and the parents have had ample time to effect a lasting adjustment. There is no doubt that Father "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" T.C.A. § 36-1-113(i)(6). Mother, likewise, failed to protect the Child from Father's abuse. The physical environment of the biological parents' home is neither healthy nor safe for the Child. After reviewing the applicable factors in light of the facts discussed at length above, we readily conclude that the evidence does not preponderate against the trial court's conclusion, made by clear and convincing evidence, that termination of Mother's and Father's parental rights is in the Child's best interest.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Ethel B. and David B., and their surety, if any, for which execution may issue. This case is remanded to the trial court for enforcement of the court's judgment and for the collection of costs assessed below, all pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE